Eugene Y. Turin (SBN 342413)
MCGUIRE LAW, P.C.
10089 Willowcreek Road, Suite 200
San Diego, CA 92131
Tel: (312) 893-7002
eturin@mcgpc.com

Robert K. Shelquist (Admitted *Pro Hac Vice*)
CUNEO GILBERT FLANNERY & LADUCA, LLP
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Tel: (612) 254-7288
Email: rshelquist@cuneolaw.com

*Counsel for Plaintiff and the Putative Class Members*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THULR ODINSSON, individually and on behalf of a class of similarly situated individuals, <br><br> *Plaintiff,* <br><br> v. <br><br> HP, INC., a Delaware Corporation, <br><br> *Defendant.* | ) Case No. 5:25-cv-09057-SVK <br> ) <br> ) **PLAINTIFF'S RESPONSE IN** <br> ) **OPPOSITION TO** <br> ) **DEFENDANT'S MOTION** <br> ) **TO DISMISS FIRST** <br> ) **AMENDED COMPLAINT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS .............................................................................. 2

III. LEGAL STANDARD ................................................................................... 3

IV. ARGUMENT .................................................................................................. 4

    A. CALIFORNIA LAW GOVERNS PLAINTIFF'S CLAIMS ...................................... 4

        1. The Limited Warranty's Choice-of-Law Provision is Not Properly Before the Court and Was Not Part of the Bargained-For Transaction. ................................. 4

        2. Enforcement of the Choice-of-Law Provision Would Violate California's Fundamental Public Policy of Consumer Protection. ............................................... 6

        3. Under the Governmental Interest Test, California Law Applies Regardless of the Warranty. ...................................................................................................... 8

    B. PLAINTIFF STATES ACTIONABLE MISREPRESENTATION CLAIMS ......... 10

        1. HP's Statements Are Specific Factual Claims, Not Puffery. .............................. 10

        2. The Overall Impression of HP's Marketing Campaign Implied Long-Term Functionality. ..................................................................................................... 11

        3. HP's Partnership and Compatibility Representations Are Distinguishable from Generic Product Praise. ..................................................................................... 13

        4. Plaintiff Did Not Receive the "Benefit of the Bargain" Because His Device Is Now Entirely Non-Functional. ......................................................................... 15

    C. PLAINTIFF STATES ACTIONABLE OMISSION CLAIMS ............................... 16

        1. HP Had a Duty to Disclose Under Multiple *LiMandri* Circumstances. .............. 16

        2. *Shipley v. Meta Platforms, Inc.* Is Distinguishable and, in Key Respects, Supports Plaintiff's Claims. ............................................................................... 18

        3. HP's Post-Deprecation Silence Is Independently Actionable, and All Claims Are Timely. ............................................................................................................. 19

    D. PLAINTIFF'S IMPLIED WARRANTY CLAIMS SURVIVE DISMISSAL .......... 21

Plaintiff's Response in Opposition to
Defendant's Motion to Dismiss First Amended Complaint

1. The Song-Beverly Act Applies Because Title Plausibly Passed in California. ....21

2. The Reverb G2's Design Defect Is Latent, and the Implied Warranty Was Breached When the Defect Existed at the Time of Sale. .......................................22

E. Plaintiff's Unjust Enrichment Claim Survives as an Independent Equitable Claim. ................................................................................................................................23

F. If the Court Grants Any Part of the Motion, It Should Grant Leave to Amend......25

V. CONCLUSION..........................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Johnson,*
335 F.3d 1179 (9th Cir. 2004) ...................................................................................................4

*America Online, Inc. v. Superior Court,*
90 Cal. App. 4th 1 (2001) ..........................................................................................................7

*Anderson v. Apple Inc.,*
500 F. Supp. 3d 993 (N.D. Cal. 2020) .....................................................................................20

*Aryeh v. Canon Bus. Solutions, Inc.,*
55 Cal. 4th 1185 (2013) ...........................................................................................................21

*Ass'n for Los Angeles Deputy Sheriffs v. Cnty of Los Angeles,*
648 F.3d 986 (9th Cir. 2011) .....................................................................................................4

*Astiana v. Hain Celestial Group, Inc.,*
783 F.3d 753 (9th Cir. 2015) ..........................................................................................2, 24, 25

*Barnert v. HP, Inc.,*
2021 WL 8895260 (N.D. Cal. Dec. 17, 2021).........................................................................6

*California State Elecs. Assn. v. Zeos Internat. Ltd.,*
41 Cal. App. 4th 1270 (1996) ..................................................................................................21

*Clemens v. DaimlerChrysler Corp.,*
534 F.3d 1017 (9th Cir. 2008) ..................................................................................................19

*Collins v. eMachines, Inc.,*
202 Cal. App. 4th 249 (2011) ..................................................................................................17

*Daniel v. Ford Motor Co.,*
806 F.3d 1217 (9th Cir. 2015) ......................................................................................1, 22, 23

*Darisse v. Nest Labs, Inc.,*
2016 WL 4385849 (N.D. Cal. Aug. 15, 2016). ........................................................................8

*Daugherty v. Am. Honda Motor Co.,*
144 Cal. App. 4th 824 (2006) ..................................................................................................19

*Drum v. San Fernando Valley Bar Assn.,*
182 Cal. App. 4th 247 (2010) ..................................................................................................19

*Edwards v. FCA US LLC,*
2022 WL 1814144 (N.D. Cal. June 2, 2022) ...........................................................................18

*Eminence Capital, LLC v. Aspeon, Inc.,*
316 F.3d 1048 (9th Cir. 2003) ..................................................................................................25

*Foman v. Davis,*
371 U.S. 178 (1962)..................................................................................................................25

*Fox v. Ethicon, Inc.*,
  35 Cal. 4th 797 (2005) ...................................................................................................20

*Galicia v. Country Coach, Inc.*,
  324 F. App'x 687 (9th Cir. 2009)....................................................................................22

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
  352 F.3d 367 (9th Cir. 2003) ....................................................................................10, 11

*Gudgel v. Clorox Co.*,
  514 F. Supp. 3d 1177 (N.D. Cal. 2021) .....................................................................23, 24

*Gusse v. Damon Corp.*,
  470 F. Supp. 2d 1110 (C.D. Cal. 2007) .....................................................................21, 22

*Herron v. Best Buy Co. Inc.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013).............................................................................17

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ..........................................................................................15

*In re Ferrero Litig.*,
  794 F. Supp. 2d 1107 (S.D. Cal. 2011)................................................................................4

*In re Plum Baby Food Litig.*,
  2025 WL 1200700 (9th Cir. Apr. 25, 2025) .....................................................................19

*In re Sony Litigation*,
  758 F. Supp. 2d 1077 (S.D. Cal. 2010)..............................................................................11

*Jefferson v. Healthline Media, Inc.*,
  674 F. Supp. 3d 760 (N.D. Cal. 2023)................................................................................24

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002) ......................................................................................................14

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...............................................................................................5

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .............................................................................................4

*Kowalsky v. Hewlett-Packard Co.*,
771 F. Supp. 2d 1138 (N.D. Cal. 2010) ..............................................................................22

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ......................................................................................................15

*Lathrop v. Thor Motor Coach, Inc.*,
  105 Cal. App. 5th 808 (2024) ..............................................................................................7

*Leoni v. State Bar*,
  39 Cal. 3d 609 (1985) .......................................................................................................14

*LiMandri v. Judkins*,
   52 Cal. App. 4th 326 (1997) ................................................................................................16, 17

*Linear Tech. Corp. v. Applied Materials, Inc.*,
   152 Cal. App. 4th 115 (2007) ....................................................................................................12

*Long v. Hewlett-Packard Co.*,
   2007 WL 2994812 (N.D. Cal. July 27, 2007)...........................................................................11

*Marchante v. Sony Corp. of Am., Inc.*,
   2011 WL 6027602 (S.D. Cal. Dec. 5, 2011)..............................................................................17

*Mazza v. American Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................................................................8

*McGee v. S-L Snacks National*,
   982 F.3d 700 (9th Cir. 2020) .....................................................................................................16

*Mexia v. Rinker Boat Co.*,
   174 Cal. App. 4th 1297 (2009) ..................................................................................................23

*Nedlloyd Lines B.V. v. Superior Court*,
   3 Cal. 4th 459 (1992) .............................................................................................................4, 6

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ...................................................................................................10

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .....................................................................................................5

*Norgart v. Upjohn Co.*,
   21 Cal. 4th 383 (1999) ...............................................................................................................20

*Ocampo v. Apple Inc.*,
   2022 WL 767614 (N.D. Cal. Mar. 14, 2022)............................................................................23

*Patt v. Antech Diagnostics, Inc.*,
   2020 WL 5076970 (C.D. Cal. May 18, 2020) ...........................................................................17

*Pitzer College v. Indian Harbor Ins. Co.*,
   8 Cal. 5th 93 (2019) .....................................................................................................................6

*Rutherford Holdings, LLC v. Plaza Del Rey*,
   223 Cal. App. 4th 221 (2014) ....................................................................................................24

*Shipley v. Meta Platforms, Inc.*,
   2025 WL 3683868 (N.D. Cal. Dec. 18, 2025)...............................................................18, 19, 20

*Sloan v. Gen. Motors LLC*,
   287 F. Supp. 3d 840 (N.D. Cal. 2018) .......................................................................................17

*Smith v. Apple, Inc.*,
   2023 WL 2095914 (N.D. Cal. Feb. 17, 2023) ...........................................................................20

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001) ................................................................................2, 4, 12

*Stearns v. Select Comfort Retail Corp.,*
    2009 WL 1635931 (N.D. Cal. June 5, 2009) ...............................................................23

*Taleshpour v. Apple Inc.,*
    549 F. Supp. 3d 1033 (N.D. Cal. 2021) ......................................................................11

*Van Mourik v. Big Heart Pet Brands, Inc.,*
    2018 WL 1116715 (N.D. Cal. Mar. 1, 2018)..................................................................9

*Washington Mut. Bank v. Superior Ct.,*
    24 Cal. 4th 906 (2001) ..................................................................................5, 8, 9

*Weeks v. Interactive Life Forms, LLC,*
    100 Cal. App. 5th 1077 (2024) ...................................................................................5

*Williams v. Gerber Prods. Co.,*
    552 F.3d 934 (9th Cir. 2008). ...................................................................10, 11, 12, 14

*Wilson v. Hewlett-Packard Co.,*
    668 F.3d 1136 (9th Cir. 2012) .................................................................................3, 4

**Statutes**

Cal. Bus. & Prof. Code § 17208 ..............................................................................20

Cal. Bus. & Prof. Code § 17500 ................................................................................9

Cal. Civ. Code § 1751...............................................................................................7

Cal. Civ. Code § 1790.1............................................................................................7

Cal. Civ. Code § 1791.............................................................................................21

Cal. Civ. Code § 1792.............................................................................................21

California Commercial Code § 2401 .........................................................................21

Cal. Civ. Proc. Code § 338 ......................................................................................20

**Rules**

Fed. R. Civ. P. 15...............................................................................................25, 26

## I.    INTRODUCTION

HP sold Plaintiff a $599 Reverb G2 virtual reality headset that, by HP's own deliberate design, could not function without a specific third-party software platform—Microsoft's Windows Mixed Reality ("WMR"). HP then marketed that dependency as a feature, advertising the Reverb G2's "collaboration" with Microsoft and "seamless integration" with WMR as core selling points. (Plaintiff's First Amended Complaint ("FAC") ¶¶ 9–10, 16.) What HP never told consumers was that their devices' entire operability hinged on software HP did not control and could not guarantee, and that HP had no plan to keep the Reverb G2 working if Microsoft pulled the plug.

Microsoft pulled the plug. In October 2024, the Windows 11 24H2 update removed WMR entirely, and Plaintiff's Reverb G2—whose hardware remains fully functional—became a permanent paperweight overnight. FAC ¶¶ 26–27, 35, 67. HP issued no warning, developed no alternative software, offered no refund, and to this day has not even acknowledged the problem on its own support page. FAC ¶¶ 29–32, 47.

HP's motion asks this Court to look past all of this. Its arguments, though numerous, share a common defect: each one requires the Court to ignore what HP actually did in favor of what HP wishes the legal question were. HP argues Minnesota law governs—but its choice-of-law provision appears in a unilateral warranty document that Plaintiff never agreed to, and its enforcement would strip statutory protections the California Legislature specifically designed to be non-waivable. HP argues its marketing statements are puffery—but "developed in collaboration with Microsoft" and "plug and play support for Windows Mixed Reality" are specific, verifiable factual claims about identified technology partners and platforms, not vague superlatives. HP argues it had no duty to disclose—but it designed the Reverb G2's dependency, marketed the dependency, and then concealed the risk the dependency created. HP argues the implied warranty expired—but the Ninth Circuit has held that a latent defect breaches the implied warranty at the time of sale, not at the time of discovery. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222 (9th Cir. 2015). And HP argues that Plaintiff's unjust enrichment claim is "duplicative"—but the Ninth Circuit in *Astiana v. Hain*

1

Plaintiff's Response in Opposition to
Defendant's Motion to Dismiss First Amended Complaint

*Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015), squarely held that such claims survive as quasi-contract claims seeking restitution.

At the motion-to-dismiss stage, the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in his favor. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The FAC alleges that HP made specific factual representations about the Reverb G2's technology partnerships and platform compatibility, that HP concealed the device's existential vulnerability, that HP abandoned its customers when that vulnerability materialized, and that HP continues to retain the full purchase price for a device that can perform none of the functions for which it was sold. These allegations state plausible claims under the UCL, FAL, CLRA, and Song-Beverly Act, for breach of implied warranty, and for unjust enrichment. HP's motion should be denied.

## II.   STATEMENT OF FACTS

HP is headquartered in Palo Alto, California, where it operates its e-commerce website, HP.com. (FAC ¶¶ 4, 55.) All advertising, marketing, and software-support decisions for the Reverb G2 originated there. (FAC ¶¶ 21–22, 56.)

In late 2020, HP released the Reverb G2, a virtual reality headset priced at $599. (FAC ¶¶ 5, 39.) HP represented that the device was developed "in collaboration with Valve and Microsoft" and that it had "worked closely with Valve and Microsoft to bring customers . . . seamless integration across Windows Mixed Reality and SteamVR platforms." (FAC ¶¶ 9–10.) HP advertised "plug and play support for Windows Mixed Reality and SteamVR" and described the Reverb G2 as "optimized for compatibility," "compatible across the industry," and "the new standard in VR." (FAC ¶¶ 7, 16, 57.) HP also marketed the Reverb product line as offering "worry-free deployment and support," emphasizing its suitability for business and professional applications. (FAC ¶¶ 8, 14, 62.)

By deliberate design choice, HP made the Reverb G2 entirely dependent on Microsoft's Windows Mixed Reality platform. (FAC ¶¶ 13, 19, 46.) Unlike competing headsets, it has zero standalone functionality and cannot even be detected by a computer without WMR. (FAC ¶¶ 13, 28.) Yet HP never disclosed that the device's basic operability hinged entirely on a platform a third party

2

could unilaterally discontinue—or that HP had no plan to support the device independently in that event. (FAC ¶¶ 36–37, 46.)

In June 2021, Plaintiff purchased a Reverb G2 from HP.com for $566, relying on HP's representations about the device's Microsoft partnership, compatibility, and status as "the new standard in VR." (FAC ¶¶ 3, 54, 58, 60, 63.) He was never informed that software support could end during the device's useful life. (FAC ¶¶ 17, 59.) Then, in December 2023, Microsoft announced WMR's deprecation (FAC ¶¶ 23–24), and in October 2024, the Windows 11 version 24H2 update removed WMR entirely. (FAC ¶ 26.) Plaintiff's computer automatically installed the update, immediately "bricking" his Reverb G2—rendering it entirely non-functional—without any action on his part. (FAC ¶¶ 65–67.) Though the hardware remains functional, the device became useless overnight solely because the software platform HP marketed as a core feature was eliminated. (FAC ¶¶ 15, 35.)

HP issued no statement, developed no alternative software, offered no compensation, and provided no advance notice about the update's impact. (FAC ¶¶ 29–32, 44.) HP continues to operate a Reverb G2 support page that omits any mention of the WMR deprecation. (FAC ¶ 47.) Plaintiff has been unable to use his device since October 2024. (FAC ¶ 69.) HP's motion relies on a one-year limited warranty containing a choice-of-law provision—a unilateral document posted on HP's website that Plaintiff was never presented with or asked to accept during checkout. (MTD at 7–9; Request for Judicial Notice ("RJN"), Exs. A–B.) Regardless, Plaintiff's claims rest on HP's pre-sale advertising, material omissions, and post-sale abandonment—not the warranty. (FAC ¶¶ 7–22, 29–52, 57–63.)

### III.    LEGAL STANDARD

Defendant moves to dismiss Plaintiffs' Claims on the merits pursuant to Federal Rules of Civil Procedure 12(b)(6). Dismissal for failure to state a claim under Rule 12(b)(6) is proper only where there is no cognizable legal theory, or an absence of sufficient facts alleged to support a cognizable legal theory. See *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (2012). When ruling on a Rule 12(b)(6) motion, the court must "accept all factual allegations in the complaint as true and construe

3

the pleadings in the light most favorable to the nonmoving party." *Ass'n for Los Angeles Deputy Sheriffs v. Cnty of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)). "A complaint need not state 'detailed factual allegations,' but must contain sufficient factual matter to 'state a claim to relief that is plausible of its face.'" *Wilson*, 668 F.3d at 1140. Thus, dismissal is only proper where "it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Adams v. Johnson*, 335 F.3d 1179, 1183 (9th Cir. 2004). Further, "[i]t is a 'rare situation' where granting a motion to dismiss claims under the UCL is appropriate." *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1115 (S.D. Cal. 2011).

**IV.     ARGUMENT**

**A.  CALIFORNIA LAW GOVERNS PLAINTIFF'S CLAIMS**

HP devotes nearly a quarter of its motion to arguing that Minnesota law governs Plaintiff's claims, which would eliminate his four California statutory causes of action at the threshold. But HP's argument rests on a choice-of-law provision in a limited warranty that was not bargained for. The argument also fails at every step of the framework provided in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992) because enforcement would violate California's fundamental policy of consumer protection—and even without the warranty, California's governmental interest test independently compels application of California law to claims arising from conduct HP directed from Palo Alto.

> **1.  The Limited Warranty's Choice-of-Law Provision is Not Properly Before the Court and Was Not Part of the Bargained-For Transaction.**

HP's entire choice-of-law argument rests on a warranty document that HP has introduced through a Request for Judicial Notice filed alongside its motion. But the First Amended Complaint does not attach, incorporate, or rely upon HP's Limited Warranty as the basis for any claim. This matters because a court considering a Rule 12(b)(6) motion is generally confined to the allegations in the complaint, documents attached to it, and documents incorporated by reference. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Khoja v. Orexigen Therapeutics,*

4

*Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (cautioning against using extrinsic documents not referenced in the complaint to dispute plaintiff's factual allegations at the pleading stage).

In any event, the warranty is not central to Plaintiff's claims. Plaintiff's six causes of action are grounded in HP's pre-sale advertising and marketing of the Reverb G2, HP's failure to disclose the device's existential dependency on a third-party software platform, and HP's abandonment of Reverb G2 consumers after Microsoft deprecated Windows Mixed Reality. *See* FAC ¶¶ 7–22, 29–52, 57–63, 77–142. The FAC's passing references to HP's "standard warranty and support services" appear only to note their *inadequacy*—i.e., that HP's warranty does not address the fundamental loss of functionality at issue. FAC ¶¶ 34–35. Mentioning a document to explain its inadequacy does not make it "central to" Plaintiff's claims.

Even if the Court were to consider the warranty, HP has not established that its choice-of-law provision is enforceable against Plaintiff. HP's Limited Warranty is a unilateral document that HP makes available on its website after the point of sale—a standard form manufacturer's warranty to which Plaintiff never affirmatively assented. HP does not allege that Plaintiff was presented with the choice-of-law provision during the checkout process, clicked "I agree," or otherwise took any unambiguous action manifesting assent. Under Ninth Circuit and California law, the mere availability of terms on a website is insufficient to bind a consumer who has not been given reasonable notice and an opportunity to assent. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) (holding browsewrap terms of use unenforceable where consumer was not required to affirmatively consent); *Weeks v. Interactive Life Forms, LLC*, 100 Cal. App. 5th 1077 (2024) (holding that browsewrap provisions requiring no affirmative assent are generally unenforceable under California law).

Under the *Nedlloyd* framework, "the advocate of the clause" bears "the burden of establishing that the various claims of putative class members fall within its scope." *Washington Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 909, 916 (2001) (applying *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992)). HP has not met this burden. It has presented no evidence—nor even alleged—that Plaintiff was aware of, presented with, or agreed to the choice-of-law provision at the time he

5

purchased his Reverb G2 from HP.com. Without a showing of mutual assent, the provision is not enforceable.

HP's heavy reliance on *Barnert v. HP, Inc.*, 2021 WL 8895260 (N.D. Cal. Dec. 17, 2021), is misplaced. In *Barnert*, the plaintiff's claims were directly tethered to HP's Instant Ink subscription program — a program governed by its own Terms of Service that the plaintiff enrolled in and whose terms he accepted. *Id.* at *5. The court found that the plaintiff's consumer protection claims "also relate[d] to the Terms of Service of the Program that is at issue." *Id.* Here, by contrast, Plaintiff did not enroll in a subscription program, did not accept Terms of Service, and does not challenge the terms of any contractual arrangement. Plaintiff challenges HP's advertising representations and material omissions that induced his purchase—conduct that predated and was independent of the warranty. FAC ¶¶ 7–22, 57–63. The California Supreme Court's reasoning in *Nedlloyd* itself supports this distinction. *Nedlloyd* addressed "two sophisticated, commercial entities" that negotiated a choice-of-law clause as part of a comprehensive shareholders' agreement governing their joint venture. 3 Cal. 4th at 468. The court's holding that such a clause encompasses "all causes of action arising from or related to that agreement" was grounded in "common sense and commercial reality" applicable to sophisticated parties with equal bargaining power. *Id.* at 469. That reasoning does not translate to a consumer product warranty unilaterally imposed by a multinational electronics manufacturer.

**2. Enforcement of the Choice-of-Law Provision Would Violate California's Fundamental Public Policy of Consumer Protection.**

Even if the choice-of-law provision were valid and reached Plaintiff's claims, the Court should decline to enforce it because doing so would violate a fundamental policy of California. Under *Nedlloyd*, a choice-of-law provision is unenforceable if "the chosen state's law is contrary to a fundamental policy of California." 3 Cal. 4th at 466. The California Supreme Court has confirmed that this "fundamental policy" exception is a meaningful limitation. *See Pitzer College v. Indian Harbor Ins. Co.*, 8 Cal. 5th 93, 103–05 (2019) (holding that a California rule constitutes a "fundamental public policy" where it cannot be contractually waived, protects against inequitable results, and promotes the public interest).

6

California's consumer protection statutes represent precisely such a fundamental policy. The Legislature has declared that the protections afforded by the CLRA and the Song-Beverly Act are unwaivable. Cal. Civ. Code § 1751 ("[a]ny waiver by a consumer of the provisions of [the CLRA] is contrary to public policy and shall be unenforceable and void."); Cal. Civ. Code § 1790.1 ("[a]ny waiver by the buyer of consumer goods of the provisions of this chapter, except as expressly provided in this chapter, shall be deemed contrary to public policy and shall be unenforceable and void."). These anti-waiver provisions reflect the Legislature's determination that consumers cannot be deprived of these protections through contractual mechanisms — whether through direct waiver, limitation, or, as here, through a choice-of-law provision that would substitute a less protective legal regime. *See America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 12–15 (2001) (holding choice-of-law provision selecting Virginia law unenforceable because it would effectively waive the statutory rights afforded by the CLRA in violation of § 1751). Applying Minnesota law to Plaintiff's claims would achieve through a choice-of-law provision exactly what the Legislature has forbidden through direct contractual waiver.

The California Court of Appeal's recent decision in *Lathrop v. Thor Motor Coach, Inc.* illustrates this principle in a closely analogous context. 105 Cal. App. 5th 808 (2024), *review granted*, No. S287893 (Jan. 15, 2025). In *Lathrop*, a manufacturer's limited warranty contained an Indiana choice-of-law provision, a forum selection clause requiring disputes to be litigated in Indiana, and a jury trial waiver. *Id.* at 812–13. The consumers brought Song-Beverly Act and CLRA claims. *Id.* The Court of Appeal reversed the trial court's enforcement of the warranty's forum selection clause, holding that Thor had not met its burden to show that litigating in Indiana would not "substantially diminish" consumers' unwaivable statutory rights under California law. *Id.* at 818. The court found this was so even though Thor offered to stipulate that California substantive law would apply in Indiana — reasoning that an Indiana court could still interpret the warranty in ways that "might diminish or eliminate one of the Lathrops' unwaivable statutory rights under California law." *Id.* at 825. The *Lathrop* court's reasoning applies with even greater force here: HP has not even offered to stipulate to California law, and its choice-of-law provision, if enforced, would entirely strip California

consumer protections from purchasers whose claims arise from conduct emanating from HP's California headquarters.

### 3. Under the Governmental Interest Test, California Law Applies Regardless of the Warranty.

Even setting aside the warranty, California law applies under the governmental interest test. *See Washington Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 915 (2001). Courts have previously found that differences exist: Minnesota's consumer protection statutes do not provide for the same restitutionary remedies available under the UCL, and Minnesota has no analogue to the Song-Beverly Act's unwaivable implied warranty protections for consumer goods. *See, e.g., Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *10 (N.D. Cal. Aug. 15, 2016). And California's interests predominate because every act giving rise to liability occurred here: HP designed the Reverb G2's WMR-dependent architecture, created and disseminated all advertising, operated the website from which Plaintiff purchased the product, and directed its post-deprecation silence—all from its Palo Alto headquarters. FAC ¶¶ 21–22, 29–32, 55–56. The Legislature intended California law to reach exactly this scenario.

HP contends that under *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), the "place of the wrong" is Minnesota because that is where Plaintiff resides. MTD at 10–11. But HP's reading of *Mazza* is incomplete. *Mazza* addressed a specific question: whether California law could be applied to a *nationwide class* of consumers who purchased vehicles across all fifty states. 666 F.3d at 589–90. The Ninth Circuit reversed class certification on the ground that applying California law to out-of-state transactions would impair those states' interests in regulating commerce within their borders. *Id.* at 594. *Mazza* did not hold that California law can *never* apply to claims by out-of-state purchasers.

This case presents the mirror image of *Mazza*'s concern. Here, the question is not whether California should export its consumer protection laws to transactions that occurred entirely in other states. It is whether California's laws should govern claims arising from deceptive advertising that HP conceived, created, and disseminated *from California*. The FAC specifically alleges that HP is

headquartered in Palo Alto, California (FAC ¶ 4); that HP.com was "operated by Defendant from its headquarters and principal place of business in Palo Alto, California" (FAC ¶ 55); that "[a]ll of HP's advertisements, marketing, and its ultimate decision to not provide ongoing support for its Reverb G2 headset originated from its Palo Alto headquarters" (FAC ¶ 21); and that "[a]ll decisions regarding what software updates or support HP would or would not provide originated in or were otherwise made in California" (FAC ¶ 22). California's interest in regulating this conduct is not 'attenuated'— it is direct and substantial. The FAL itself reflects this interest by expressly prohibiting any corporation from making or disseminating "*from this state* before the public in any state" any untrue or misleading statement. Cal. Bus. & Prof. Code § 17500 (emphasis added). The California Legislature crafted the FAL to reach deceptive advertising *originating from California*, regardless of where the consumer receiving the advertising happens to reside. Declining to apply California law here would undermine this core legislative purpose.

HP's reliance on *Van Mourik v. Big Heart Pet Brands, Inc.*, 2018 WL 1116715 (N.D. Cal. Mar. 1, 2018) and other cases emphasizing foreign states' interests in regulating transactions within their borders is inapposite. Those cases address the *third step* of the governmental interest test— weighing competing interests. But at the third step, the question is which state's interest "would be more impaired if its law were not applied." *Washington Mutual*, 24 Cal. 4th at 910. California's interest in policing deceptive advertising originating within its borders is at least as strong as Minnesota's interest in regulating advertising received by its residents. California's interest is strengthened by the fact that it also seeks to prevent one company from getting a competitive advantage over other in-state competitors through sharp business practices. Indeed, HP chose to headquarter its operations in California, to operate its website from California, and to direct its advertising campaigns from California. Having availed itself of California as the locus of its business operations, HP cannot now argue that California has no interest in whether those operations comply with California law.

Accordingly, even without the choice-of-law provision, the governmental interest test supports application of California law to Plaintiff's claims.

### B.  PLAINTIFF STATES ACTIONABLE MISREPRESENTATION CLAIMS

HP contends that none of its marketing statements about the Reverb G2 are actionable because they constitute either puffery, statements about a different product, or statements that were true when made. HP further argues that Plaintiff received the "benefit of the bargain" because his headset functioned for several years before becoming non-functional. Both contentions fail. HP's marketing campaign went far beyond vague aspirational language—it made specific, verifiable factual representations about the Reverb G2's technology partnerships, platform compatibility, and software integration that a reasonable consumer would rely upon. And a consumer whose $599 device has become a permanent paperweight has manifestly not received the benefit of his bargain.

#### 1.  HP's Statements Are Specific Factual Claims, Not Puffery.

The distinction between actionable misrepresentations and non-actionable puffery is well established. Puffery refers to "generalized, vague and unspecific assertions" of product superiority "upon which a reasonable consumer could not rely." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003). By contrast, "a statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). Whether a statement is actionable turns on whether "members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

HP thus conflates two fundamentally different categories of statements. The FAC does cite certain language that is generalized in nature but the core of Plaintiff's misrepresentation claim rests on an entirely different set of statements that are concrete, specific, and objectively verifiable. HP represented that the Reverb G2 was "developed in collaboration with Valve and Microsoft" (FAC ¶ 9)—a specific factual assertion identifying particular technology partners by name. HP represented that it "worked closely with Valve and Microsoft to bring customers . . . seamless integration across Windows Mixed Reality and SteamVR platforms" (FAC ¶ 10), a specific factual claim about the nature of the collaboration and the platforms it targeted. HP marketed the Reverb G2 as featuring "plug and play support for Windows Mixed Reality and SteamVR" (FAC ¶¶ 7, 16), a specific technical capability claim tied to identified software platforms. Even HP's product page claims

10

describing the Reverb G2 as "optimized for compatibility" and "compatible across the industry" (FAC ¶ 57) take on concrete meaning in context, as they were directed at the product's interoperability with the specifically identified Windows Mixed Reality ecosystem upon which the Reverb G2 wholly depended. These statements are nothing like the vague superlatives that courts have found to be non-actionable puffery. In *Long v. Hewlett-Packard Co.*, the statements at issue were that HP's laptops were "a reliable mobile computing solution" that "allow the user to do more on the move." 2007 WL 2994812, at *6 (N.D. Cal. July 27, 2007). In *Taleshpour v. Apple Inc.*, the challenged statements described Apple laptops as "revolutionary," "groundbreaking," and offering "breakthrough performance." 549 F. Supp. 3d 1033, 1040 (N.D. Cal. 2021). And in *In re Sony Litigation*, the court found non-actionable "generalized and vague statements of product superiority" such as "superb" and "uncompromising quality." 758 F. Supp. 2d 1077, 1089 (S.D. Cal. 2010).

Each of those cases involved subjective, immeasurable claims that no reasonable consumer could verify or rely upon as statements of fact. The statements at issue here are qualitatively different. "Developed in collaboration with Microsoft" is not a subjective assessment of product quality—it is an assertion of an objective business relationship with a named, industry-leading entity. "Plug and play support for Windows Mixed Reality" is not a vague promise of quality—it is a specific, verifiable representation about the product's technical architecture. A reasonable consumer can and would rely on these representations as concrete, factual commitments about what the product is and how it works, precisely the type of statements that fall outside the ambit of puffery. *See Glen Holly*, 343 F.3d at 1005, 1015 (distinguishing specific, verifiable claims about a product's characteristics from generalized, vague assertions constituting mere puffery).

### 2. The Overall Impression of HP's Marketing Campaign Implied Long-Term Functionality.

Even setting aside the individual statements, the Ninth Circuit has made clear that claims under the UCL, FAL, and CLRA must be evaluated based on the overall impression that advertising conveys to a reasonable consumer—not by dissecting individual statements in isolation. *See Williams*, 552 F.3d at 938. In *Williams*, the court held that while a claim that Gerber's product was

11

"nutritious" might "arguably constitute puffery" if standing alone, the statement "certainly contributes . . . to the deceptive context of the packaging as a whole," and the court declined to "give Gerber the benefit of the doubt by dismissing the statement as puffery." *Id.* at 938 n.3. The same analysis applies here. HP's marketing campaign, viewed as a whole, conveyed a clear and consistent message to consumers: the Reverb G2 was a premium, professionally oriented device built on a stable technology platform in partnership with one of the world's largest software companies. HP advertised the device as having been developed collaboratively with Microsoft (FAC ¶¶ 9–10), as being designed for business and professional applications that inherently demand long-term reliability (FAC ¶ 14), as being "compatible across the industry" (FAC ¶ 57), and as representing "the new standard in VR" (FAC ¶ 57). HP priced the Reverb G2 at $599, a premium price point that itself communicated quality and durability in the VR hardware space. FAC ¶ 39. And HP described its Reverb product line as offering "worry-free deployment and support." FAC ¶¶ 8, 62.

Taken together, these representations created a net impression that the Reverb G2 would remain a functional, supported product for a reasonable period of time. A reasonable and ordinary consumer reading HP's marketing would not have understood it to mean that the device could become entirely non-functional—through no fault of the consumer—within a few years of purchase. Whether HP's campaign would actually mislead a reasonable consumer is a factual question that cannot properly be resolved on a motion to dismiss. *Williams*, 552 F.3d at 938; *see also Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) ("[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer.").

HP asks this Court to do precisely what the *Williams* court held was error—to conclude, "without considering any evidence beyond the [advertising] itself," that Plaintiff's complaint "failed to state a viable claim." *Williams*, 552 F.3d at 939. At this stage, Plaintiff's factual allegations must be accepted as true and construed in the light most favorable to him. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The FAC plausibly alleges that HP's marketing

campaign would mislead a reasonable consumer into believing the Reverb G2 was built on a stable, enduring platform. That is sufficient to survive a motion to dismiss.

### 3. HP's Partnership and Compatibility Representations Are Distinguishable from Generic Product Praise.

HP raises three sub-arguments in attempting to neutralize the specific factual representations at the heart of Plaintiff's claims: that the "worry-free deployment" statement concerned a different product, that the compatibility and partnership statements were true when made, and that none of these statements imply anything about the Reverb G2's longevity. None of these arguments succeeds.

*The "Different Product" Argument*

HP contends that the "worry-free deployment and support" language appeared in a 2019 press release about the first-generation Reverb headset, not the Reverb G2. MTD at 12. But the Reverb G1 and the Reverb G2 share the same fundamental architecture: both are PC-tethered VR headsets wholly dependent on Windows Mixed Reality software, both were marketed as part of HP's Reverb product line, and the G2 was explicitly marketed as an improved version of the G1. FAC ¶¶ 5–6. A reasonable consumer encountering HP's Reverb marketing would naturally understand representations about the product line's deployment and support to carry forward to its latest and most prominently advertised iteration. Moreover, regardless of which product the 2019 press release concerned, its content sheds light on the broader message HP communicated to consumers about its approach to VR products—specifically, that HP was focused on creating devices offering "worry-free deployment and support." FAC ¶ 62. That HP chose this language for the Reverb product line is relevant to how a reasonable consumer would interpret HP's subsequent marketing of the Reverb G2.

*The "True at the Time" Argument*

HP argues that its statements about the Reverb G2 being "developed in collaboration with" Microsoft and having "plug and play support for Windows Mixed Reality" were true when made and therefore cannot support a false advertising claim. MTD at 13. This argument misapprehends California law. The California Supreme Court has recognized that the FAL and UCL prohibit "not only advertising which is false, but also advertising which [,] although true, is either actually

13

misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) (quoting *Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985)). A statement can be literally true yet misleading by virtue of what it implies and omits. When HP represented that the Reverb G2 was developed "in collaboration with" Microsoft and offered "seamless integration across Windows Mixed Reality and SteamVR platforms," those statements—while perhaps technically accurate when parsed—conveyed the overall impression that HP and Microsoft had a durable, cooperative relationship that would undergird the product's functionality going forward. FAC ¶¶ 9–10. That impression was misleading because it omitted the critical fact that the Reverb G2's *entire functionality* depended on a single third-party software platform that Microsoft could unilaterally discontinue, and that HP had no ability or plan to maintain the device's operability if that occurred. FAC ¶¶ 13, 19, 36–37, 46. The question of whether these technically-true parsed statements, when considered in context or adjudged by the overall impression created, would mislead a reasonable consumer is a factual issue that cannot be decided on a Rule 12(b)(6) motion. *Williams*, 552 F.3d at 938–39.

### The "Nothing About Longevity" Argument

HP argues that none of its marketing statements "imply anything about the . . . Reverb G2's longevity." MTD at 13. But this argument ignores both context and common sense. When a leading electronics manufacturer markets a $599 product for business and professional applications (FAC ¶ 14), describes it as "the new standard in VR" (FAC ¶ 57), and emphasizes its development alongside one of the world's most established technology companies (FAC ¶¶ 9–10), the manufacturer is creating the impression  that this is not a disposable product with an abbreviated lifespan. A reasonable and ordinary consumer would understand these representations to mean that the Reverb G2 would function for a period commensurate with other premium consumer electronics—not that it could become a "paperweight" (FAC ¶ 68) within a few years of purchase.

The Ninth Circuit has recognized that the reasonable consumer test requires consideration of how real consumers actually process advertising in context. *See Williams*, 552 F.3d at 938 (looking at "packaging as a whole"). Whether HP's advertising, taken as a whole, created the overall

14

impression that the Reverb G2 would have a reasonable useful life is a factual question that cannot properly be resolved on the pleadings.

### 4. Plaintiff Did Not Receive the "Benefit of the Bargain" Because His Device Is Now Entirely Non-Functional.

HP argues that Plaintiff "received exactly what he admittedly expected and bargained for—a premium VR headset . . . that would remain functional for years." MTD at 1–2 (citing FAC ¶ 39). This argument fails for two independent reasons: it misstates the governing law on economic injury, and it ignores the undisputed fact that Plaintiff's device is no longer functional at all.

The California Supreme Court directly addressed — and rejected — the benefit-of-the-bargain defense to consumer standing in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011). In *Kwikset*, the defendant argued that consumers lacked standing because they received functional locksets worth what they paid, notwithstanding false "Made in U.S.A." labeling. *Id.* at 327–28. The Court rejected this argument, reasoning that "labels matter" and that "the marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label." *Id.* at 328. A consumer who alleges he relied on a misrepresentation and would not have purchased the product otherwise has suffered sufficient economic injury to establish standing. *Id.* at 329–30. The Court explained that a misrepresentation is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* at 332 (quoting Restatement (Second) of Torts § 538, subd. (2)(a)). As the Ninth Circuit later held in applying *Kwikset*, the benefit-of-the-bargain defense "is permissible only if the misrepresentation that the consumer alleges was not 'material.'" *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013).

Here, Plaintiff alleges that HP's representations about the Reverb G2's Microsoft partnership, WMR compatibility, and "industry" compatibility were material to his purchasing decision (FAC ¶¶ 58, 60, 63), and that he "would not have purchased [the] device" but for those representations (FAC ¶¶ 80, 104). Under *Kwikset* and *Hinojos*, these allegations are sufficient to establish standing and preclude the benefit-of-the-bargain defense at the pleading stage. And HP's benefit-of-the-bargain

argument is even weaker here than in *Kwikset* and *Hinojos*, where the products at issue were at least still functional. The Reverb G2 is not merely worth less than what Plaintiff paid—it is worth nothing. The device has been "bricked," rendering it "entirely non-functional." FAC ¶ 67.

The cases HP cites for the benefit-of-the-bargain defense are readily distinguishable because they involve products that continued to perform their basic function. In *McGee v. S-L Snacks National*, the Ninth Circuit found no economic injury where the plaintiff's popcorn contained a disclosed ingredient she considered unhealthy — but the product still functioned as popcorn. 982 F.3d 700, 706 (9th Cir. 2020). Here, by contrast, Plaintiff's Reverb G2 does not function *at all*. It cannot be used for any purpose. A $599 device that has been rendered entirely and permanently inoperable is not a product whose purchaser received the "benefit of the bargain" — it is a product that has no value whatsoever. HP's suggestion that Plaintiff somehow got his money's worth because the device worked for a few years before becoming permanently useless finds no support in the law and defies common sense.

## C. PLAINTIFF STATES ACTIONABLE OMISSION CLAIMS

HP frames Plaintiff's omission theory as a demand for "clairvoyance" about Microsoft's future decisions. MTD at 16. This mischaracterizes the claim. Plaintiff does not allege that HP should have predicted when Microsoft would deprecate WMR. He alleges that HP designed the Reverb G2 to be wholly dependent on a single third-party software platform, marketed that dependency as a benefit, and never disclosed the existential risk this architectural choice posed. FAC ¶¶ 13, 19–20, 36–37, 46. These are facts HP knew from the day it first marketed the product, no clairvoyance required.

### 1. HP Had a Duty to Disclose Under Multiple *LiMandri* Circumstances.

A duty to disclose arises in four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). In the consumer product context, an omission

is actionable when the plaintiff alleges the omission was material, the undisclosed defect is central to the product's function, and at least one *LiMandri* circumstance is present. *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 258 (2011), as modified (Dec. 28, 2011); *see also Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840 (N.D. Cal. 2018), *order clarified*, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), and *on reconsideration*, 438 F. Supp. 3d 1017 (N.D. Cal. 2020) (denying motion to dismiss omission-based fraud and consumer protection claims where plaintiffs alleged engine defect central to vehicle function and defendant's exclusive pre-sale knowledge).

HP designed the Reverb G2 to have zero standalone functionality—unlike competing headsets that either operate independently or run proprietary software, the Reverb G2 cannot even be detected by a computer without WMR. FAC ¶¶ 13, 19, 28, 46. HP knew this because HP made it so. An ordinary consumer had no way to know that WMR was not merely a feature of the device but the sole means by which it could ever function, or that HP had no intent to support the device if WMR was discontinued. The difference between "this device works with WMR" and "this device cannot work without WMR and we will not support it independently" is the undisclosed material fact at the heart of this case. HP's exclusive knowledge of this architectural reality satisfies the second and fourth *LiMandri* circumstances. Contrary to HP's suggestion that "generalized allegations with respect to exclusive knowledge are insufficient" (MTD at 17 (citing *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1175 (E.D. Cal. 2013))), Plaintiff's allegations are not generalized—they identify a specific design choice that HP alone made and controlled. Though it may be true that a manufacturer need not "disclose facts of which it was unaware," *Marchante v. Sony Corp. of Am., Inc.*, 2011 WL 6027602, at *3 (S.D. Cal. Dec. 5, 2011), the fact here is that HP was fully aware that its own product could not function without a third-party platform it did not control and for which it had no back up plan. By telling consumers about its Microsoft partnership while concealing the substantial risk it created, HP made "partial representations but also suppress[ed] some material facts." *LiMandri*, 52 Cal. App. 4th at 336. HP's reliance on *Patt v. Antech Diagnostics, Inc.*, 2020 WL 5076970 (C.D. Cal. May 18, 2020), for the proposition that no partial representations were misleading, is inapposite because *Patt* addressed a case where the court had already found the affirmative representations were not

17

actionable. Here, by contrast, as demonstrated in Section B *supra*, HP's factual representations about its Microsoft partnership and WMR integration are actionable—and they become affirmatively misleading when the qualifying risks they omitted and concealed are considered.

### 2. *Shipley v. Meta Platforms, Inc.* Is Distinguishable and, in Key Respects, Supports Plaintiff's Claims.

HP leans heavily on *Shipley v. Meta Platforms, Inc.*, 2025 WL 3683868 (N.D. Cal. Dec. 18, 2025), where this District dismissed omission claims by purchasers of Meta's Portal device. *Shipley* is distinguishable in three critical respects.

*First*, Shipley involved a manufacturer's own decision to strip features from its product. The court held plaintiffs could not show that Meta "knew at the time of plaintiffs' purchase that it was going to strip the functionality of the Portal." *Id.* at *6. Here, the relevant knowledge concerns the existing design of the product—its total WMR dependency—not anyone's future plans. HP knew about this dependency because HP created it.

*Second*, HP affirmatively marketed the dependency that caused the harm, touting its Microsoft collaboration as a core selling point. FAC ¶¶ 7, 9–10, 16, 57. Meta made no comparable partial representations about third-party software dependencies, so the *Shipley* court had no occasion to evaluate the fourth *LiMandri* circumstance. HP's marketing of its Microsoft partnership triggered an independent duty to disclose the risks that partnership entailed—a duty the *Shipley* defendant never assumed. Nor did the *Shipley* court confront allegations of active concealment comparable to those here; HP's continued maintenance of a Reverb G2 support page that omits all mention of the WMR deprecation (FAC ¶ 47) constitutes the type of affirmative acts "sought to suppress information . . . or obscure the consumer's ability to discover it" that satisfies the third *LiMandri* circumstance. *Edwards v. FCA US LLC*, 2022 WL 1814144, at *4 (N.D. Cal. June 2, 2022) (denying motion to dismiss where manufacturer knew of transmission defect and defining active concealment as affirmative acts "sought to suppress information in the public domain or obscure the consumer's ability to discover it"); *cf. In re Plum Baby Food Litig.*, 2025 WL 1200700, at *2 (9th Cir. Apr. 25,

18

2025) (finding no active concealment where plaintiff did not allege affirmative acts of hiding or covering up).

**Third**, *Shipley* actually allowed the UCL "unfair" prong to survive, holding that plaintiffs "plausibly allege[d]" unfair conduct because Meta "caus[ed] them substantial injury by charging a premium" for software features it later removed. 2025 WL 3683868 at *9. The court found that such conduct was "'immoral, unethical, oppressive, unscrupulous or substantially injurious.'" *Id.* (quoting *Drum v. San Fernando Valley Bar Assn.*, 182 Cal. App. 4th 247 (2010)). If bricking a product the manufacturer itself chose to abandon states an unfair practice claim, the case is *a fortiori* stronger where the manufacturer designed a dependency on a third party, marketed that dependency as a benefit, and then offered nothing when the dependency destroyed the product. HP plainly possessed the expertise to develop a workaround, particularly just two years after sale, yet willfully concealed that it had no present or future intention to deploy its own resources to do so.

HP cites *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), and *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006) for the proposition that a product "that functions precisely as warranted throughout the term of its express warranty . . . does not constitute an unfair practice under the UCL." MTD at 16. But those cases involved latent hardware defects that shortened a product's lifespan after the warranty period—not a deliberate design choice to make the product wholly dependent on third-party software that was then marketed as a feature. The Reverb G2's WMR dependency was not a latent defect akin to a car engine wearing out prematurely—it was a deliberate architectural choice that created a categorical risk of total product failure.

### 3. HP's Post-Deprecation Silence Is Independently Actionable, and All Claims Are Timely.

Even if HP had no duty to disclose at the time of Plaintiff's 2021 purchase, HP's conduct after Microsoft's December 2023 deprecation announcement independently supports liability. At that point, HP had actual knowledge that every Reverb G2 would become non-functional upon the next Windows update—yet HP issued no statement, developed no alternative software, offered no

19

compensation, provided no advance notice to consumers, and continued to operate a support page that omitted any mention of the problem. FAC ¶¶ 29–32, 44, 47.

HP argues that an omission in 2023, years after Plaintiff's purchase, could not have affected Plaintiff's purchasing decision and therefore caused no harm. MTD at 20 (citing *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1017 (N.D. Cal. 2020)). But the harm from HP's post-2023 silence is not that it affected a past purchasing decision—it is that HP's failure to warn consumers deprived them of the ability to take protective action (e.g., declining the Windows 11 24H2 update or seeking a remedy before their devices were bricked). FAC ¶¶ 33, 44, 65–67. Plaintiff's computer was configured for automatic updates, as recommended by cybersecurity experts, and the absence of any warning from HP meant Plaintiff's device was bricked without any opportunity to intervene. FAC ¶¶ 65–66. This conduct also independently satisfies the UCL "unfair" prong: HP's silence while its customers' $599 devices became permanently inoperable constitutes "substantially injurious" conduct with no countervailing consumer benefit. *Shipley*, 2025 WL 3683868, at *14.

HP's statute-of-limitations defense is equally meritless. Under California's discovery rule, a cause of action does not accrue "until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon, Inc.*, 35 Cal. 4th 797, 807 (2005) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 387 (1999)). To invoke the rule, a plaintiff must plead "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox* at 808. HP contends that Plaintiff fails to plead such facts (MTD at 20 (citing *Smith v. Apple, Inc.*, 2023 WL 2095914, at *4 (N.D. Cal. Feb. 17, 2023))), but the FAC itself supplies them: Plaintiff had no reason to suspect injury until, at the earliest, Microsoft's December 2023 announcement, and the actual injury did not occur until October 2024, when the 24H2 update bricked his device. FAC ¶¶ 64, 66–67. Plaintiff filed suit on October 21, 2025—well within the three-year limitations periods for FAL and CLRA claims (Cal. Civ. Proc. Code § 338(a); Cal. Civ. Code § 1783) and the four-year UCL period (Cal. Bus. & Prof. Code § 17208), regardless of which accrual date is used. Moreover, under the continuous accrual doctrine, HP's ongoing concealment—including its continued maintenance of a support page omitting any acknowledgment of the WMR deprecation (FAC ¶ 47)—constitutes a

20

continuing wrong with its own limitations period. *See Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1198–99 (2013). HP's timeliness argument should be rejected.

### D. PLAINTIFF'S IMPLIED WARRANTY CLAIMS SURVIVE DISMISSAL

HP raises two arguments against Plaintiff's implied warranty claims: that the Song-Beverly Consumer Warranty Act does not apply to Plaintiff's purchase, and that the implied warranty period expired before the device became non-functional. MTD at 21–22. Neither argument warrants dismissal. The FAC plausibly alleges that the sale occurred in California, and in any event, the Reverb G2's total dependency on WMR is a latent design defect that existed at the time of sale—the type of defect that the Ninth Circuit has held can breach the implied warranty even when discovered after the warranty period expires.

#### 1. The Song-Beverly Act Applies Because Title Plausibly Passed in California.

Under the Song-Beverly Consumer Warranty Act, every "sale" of consumer goods in California carries an implied warranty of merchantability that cannot be disclaimed. Cal. Civ. Code §§ 1792, 1791(n). A "sale" means "the passing of title from the seller to the buyer for a price." Cal. Civ. Code § 1791(n). The critical question is therefore *where title passed*—not where the consumer resides.

Under California Commercial Code § 2401(2)(a), unless otherwise agreed, in a contract requiring the seller to "send the goods to the buyer"—i.e., a shipment contract—"title passes to the buyer at the time and place of shipment." *Gusse v. Damon Corp.*, 470 F. Supp. 2d 1110, n.7 (C.D. Cal. 2007) (citing Cal. Com. Code § 2401(2)(a)) (explaining that if a "California retailer" delivers goods "to its parcel carrier of choice, who in turn ships the widgets to the buyer" in another state, "[t]itle to the widgets would pass in California upon shipment, and the Song-Beverly Act would apply"); *see also California State Elecs. Assn. v. Zeos Internat. Ltd.*, 41 Cal. App. 4th 1270 (1996) (holding that the Song–Beverly Act did not apply to personal computers shipped by Minnesota retailer to buyer in California because title passed in Minnesota–not California–upon shipment).

The FAC alleges that Plaintiff "purchased the Reverb G2 device in June of 2021 directly from Defendant's website, which is operated and managed from California." FAC ¶ 116. HP is

headquartered in Palo Alto, California (FAC ¶ 4), and its website HP.com is "operated by Defendant from its headquarters and principal place of business in Palo Alto, California" (FAC ¶ 55). Accepting these allegations as true, as the Court must at this stage, Plaintiff plausibly alleges that HP shipped the Reverb G2 from California, making this a shipment contract under which title passed in California upon delivery to the carrier. *See Gusse*, 470 F. Supp. 2d 1110, n.7.

HP cites *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1138 (N.D. Cal. 2010), and *Galicia v. Country Coach, Inc.*, 324 F. App'x 687 (9th Cir. 2009), for the proposition that Song-Beverly does not apply to out-of-state purchasers. But *Kowalsky* is distinguishable: there, the court found that "nothing in the FAC suggest[ed] that Plaintiff was in California when he made the purchase," and the plaintiff alleged only that HP was a California corporation—he did not allege that the product was shipped from California or that the website was operated from California. 771 F. Supp. 2d at 1155. Here, Plaintiff has supplied precisely the allegations *Kowalsky* found missing: that HP.com is operated from Palo Alto, that all marketing and support decisions originate from California, and that the transaction was processed through HP's California-based operations. FAC ¶¶ 4, 21–22, 55–56, 116. *Galicia* is similarly distinguishable because it involved a recreational vehicle purchased and delivered in Oregon, 324 F. App'x at 688-89—a plainly out-of-state transaction with no California nexus comparable to a purchase processed through a California-headquartered seller's California-operated website.

**2. The Reverb G2's Design Defect Is Latent, and the Implied Warranty Was Breached When the Defect Existed at the Time of Sale.**

HP argues that "Plaintiff's Reverb G2 functioned during any implied warranty period, which would have ended no later than 2022." MTD at 22. This argument assumes that the implied warranty can only be breached by a defect that *manifests* during the warranty period. The Ninth Circuit has squarely rejected that assumption.

In *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015), the Ninth Circuit held that California Civil Code § 1791.1(c)—which limits the implied warranty's duration to one year—"does not create a deadline for discovering latent defects or for giving notice to the seller." *Id.* at 1222

(quoting *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1310 (2009)). Rather, "the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Mexia*, 174 Cal. App. 4th at 1305. The Ninth Circuit emphasized that *Mexia* is binding absent "convincing evidence that the California Supreme Court would decide the issue . . . differently," and found no published or unpublished California court opinions disapproving or rejecting *Mexia*. *Daniel*, 806 F.3d at 1222.

The Reverb G2's total dependency on WMR is precisely the type of latent design defect *Mexia* and *Daniel* address. From the moment of sale, the Reverb G2 was designed so that it "cannot function without a connection to a Windows computer" running WMR (FAC ¶ 12), is "wholly dependent on Microsoft's Windows Mixed Reality platform to function" (FAC ¶ 13), and has "zero" independent capability (FAC ¶¶ 18–20). This architectural vulnerability was a defect in the product's design that existed at the time of sale—it was simply latent and undiscoverable by a consumer until Microsoft announced and executed the WMR deprecation. A consumer purchasing the Reverb G2 in 2021 had no way to know that the device's entire operability hinged on a single third-party software platform with no fallback—that is the very definition of a latent defect.

HP cites *Ocampo v. Apple Inc.*, 2022 WL 767614 (N.D. Cal. Mar. 14, 2022), and *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931 (N.D. Cal. June 5, 2009), for the proposition that implied warranty claims fail when the "alleged issue did not arise until years later." MTD at 22–23. But in both cases, the plaintiffs' products functioned for their intended purpose throughout the warranty period and beyond; the alleged defects related to gradual wear and tear—not total and sudden product failure caused by an architectural vulnerability embedded from day one. Here, the Reverb G2 was not a product that gradually wore out, it was one software update away from total failure from the day it was sold.

### E.  Plaintiff's Unjust Enrichment Claim Survives as an Independent Equitable Claim.

HP devotes a single paragraph to its unjust enrichment argument, asserting that the claim "turns on the same allegations as his other claims" and therefore "fails alongside" them. MTD at 23 (citing *Gudgel v. Clorox Co.*, 514 F. Supp. 3d 1177, 1188 (N.D. Cal. 2021); *Jefferson v. Healthline*

*Media, Inc.*, 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023)). This argument fails for two independent reasons: Plaintiff's other claims survive (as demonstrated above), and unjust enrichment is independently viable as a quasi-contract claim regardless.

Unjust enrichment cannot be dismissed as "duplicative." The Ninth Circuit has squarely addressed and rejected the argument HP advances here. In *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015), the district court dismissed the plaintiff's unjust enrichment claim as "not a standalone cause of action in California and . . . nonsensical as pled." *Id.* at 762. The Ninth Circuit reversed on this point, holding that while unjust enrichment is not a freestanding cause of action in California, courts may "construe the cause of action as a quasi-contract claim seeking restitution." *Id.* (citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)). Critically, the court held that the plaintiff stated a valid quasi-contract claim because she alleged the defendant had "enticed" her to purchase its products through "false and misleading" labeling and was "unjustly enriched as a result." *Id.*

Both *Gudgel* and *Jefferson* dismissed unjust enrichment claims *only after* concluding that all of the plaintiff's underlying substantive claims independently failed on the merits. *See Gudgel*, 514 F. Supp. 3d at 1188 (dismissing unjust enrichment after finding plaintiff did not satisfy the reasonable consumer test on any claim); *Jefferson*, 674 F. Supp. 3d at 764 (same). Those cases hold, at most, that where a plaintiff has identified *no* actionable conduct whatsoever, a quasi-contract claim premised on the same non-actionable conduct also fails. That principle is inapplicable here because, as demonstrated in Sections B through D above, Plaintiff's misrepresentation, omission, and implied warranty claims each independently survive dismissal.

The equitable basis for the claim is independently compelling because the factual allegations support unjust enrichment on their own terms. HP collected $566 from Plaintiff for a premium VR headset whose hardware remains fully functional but that HP's own design choices rendered entirely useless. FAC ¶¶ 35, 54, 67–68, 134–42. HP has offered no refund, no credit, no trade-in, and no software remedy. FAC ¶¶ 30–32. HP continues to retain the full purchase price for a product that cannot perform any function for which it was sold. Under these circumstances, HP's retention of

24

Plaintiff's payment is unjust, and restitution is the appropriate equitable remedy—irrespective of whether any particular statutory claim independently survives. *See Astiana*, 783 F.3d at 762 (quasi-contract claim is viable where defendant was "unjustly enriched" by payments induced through its conduct).

**F.  If the Court Grants Any Part of the Motion, It Should Grant Leave to Amend.**

Should the Court find any of Plaintiff's claims deficient, it should dismiss with leave to amend rather than with prejudice. HP asks this Court to dismiss the FAC "without leave to amend" (MTD at 24), but this request contravenes the Supreme Court's directive and the Ninth Circuit's longstanding liberal amendment policy.

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave when justice so requires." The Supreme Court has held that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Ninth Circuit applies this policy "with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Denial of leave to amend is warranted only where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment." *Foman*, 371 U.S. at 182. None of these circumstances is present here. There has been no undue delay—this case was filed only four months ago, in October 2025, and the FAC is Plaintiff's first amendment. There is no bad faith or dilatory motive; Plaintiff amended promptly and in good faith in response to HP's initial motion to dismiss. And HP will suffer no prejudice, as discovery has not yet commenced and the case is in its earliest stages. Amendment would not be futile—even if the Court were to identify any pleading deficiency, Plaintiff can cure it. Courts routinely grant leave to amend at least once before closing the door to further pleading, recognizing that the "strong policy permitting amendment" serves the judicial system's interest in resolving disputes on their merits. *Eminence Capital*, 316 F.3d at 1052 (reversing denial of leave to amend where the district court failed to apply Rule 15's policy with sufficient liberality). If this Court finds dismissal of any of Plaintiff's claims appropriate, then it should follow the same approach here.

25

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny HP's Motion to Dismiss in its entirety. In the alternative, should the Court find any claim deficient, Plaintiff requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2).

Dated: February 18, 2026                    MCGUIRE LAW, P.C.

By:  /s/ *Joseph M. Dunklin*
Eugene Y. Turin (SBN 342413)
MCGUIRE LAW, P.C.
10089 Willowcreek Road, Suite 200
San Diego, CA 92131
Tel: (312) 893-7002
eturin@mcgpc.com

Joseph M. Dunklin (Admitted *Pro Hac Vice*)
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
jdunklin@mcgpc.com

Robert K. Shelquist (Admitted *Pro Hac Vice*)
CUNEO GILBERT Flannery & LADUCA, LLP
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Tel: (612) 254-7288
Email: rshelquist@cuneolaw.com

Michael J. Flannery, CA (SBN 196266)
CUNEO GILBERT & LADUCA, LLP
2 City Place Drive, Suite 200
St. Louis, MO 63141-7055
Tel: (314) 226-1015
Email: MFlannery@cuneolaw.com

Patrick R. Burns (*Pro Hac Vice Forthcoming*)
BURNS LAW FIRM
218 Washington Avenue North, Suite 220
Minneapolis, MN 55401
Tel: (612) 877-6400
Email: Patrick@burns-law.mn

*Attorneys for Plaintiff and the Putative Class*

26